# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
                       )
            Respondent, )
                       )
           v. )
                       )
MARK CURTIS HUDSON, )
                       )
           Appellant. )
                       )

No. 68807-3-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: January 21, 2014

APPELWICK, J. — Hudson appeals his convictions for witness tampering and violation of a court order. He argues that there is insufficient evidence to support his witness tampering conviction. The State agrees and concedes error, so we accordingly reverse and dismiss that conviction. Hudson also alleges prosecutorial misconduct and argues that a detective improperly testified to the identity of the victim in a voice recording. We affirm Hudson's conviction for violation of a court order.

## FACTS

This appeal arises from Mark Hudson's alleged assault of Rebecca Hudson.[1] On September 16, 2010, police responded to a 911 call in South Seattle. Rebecca met them at the front door. She was crying and upset, and her thumb was bleeding. She told the officers that her husband, Mark Hudson, had cut her hand and left shortly after. Paramedics also responded and examined Rebecca's injuries. Rebecca told the treating paramedic that her husband had choked her and cut her with a knife. One of

---

[1] We refer to Rebecca by her first name to avoid any confusion. She identified herself as Rebecca Hudson to the responding officers and paramedics. However, at trial, Rebecca testified that her name was Rebecca Brooks, and that she had never gone by the name Rebecca Hudson.

the officers wrote down Rebecca's statement detailing the incident, which he had Rebecca read and sign.

The next day, Detective Christopher Johnson began investigating the case. He called Rebecca that day, spoke to her on the phone twice, and took an eight to nine minute voice-recorded statement from her. Johnson then referred the case to the King County Prosecuting Attorney's Office.

The State charged Hudson with felony assault and felony harassment. The State also entered a no-contact order prohibiting Hudson from contacting Rebecca.

From jail, Hudson made eleven telephone calls to a woman and successfully reached her four times. They discussed using Hudson's computer for a chat program, car repairs, bills to be paid, Hudson's medications, and their relationship.[2] In the last call, made on November 2, 2010, Hudson asked the woman whether a prosecutor had been assigned to his case yet. He instructed the woman to tell the prosecutor that she had relocated to Texas. He then said, "once it goes out I'm thinking I should get out either tomorrow or the, or the day after." Hudson told the woman not to answer calls from numbers she did not recognize, and not to reply to any e-mails. The woman agreed. Each of these calls was made from the jail unit where Hudson was housed to Rebecca's phone number at the time.

On December 17, 2010, the trial court dismissed Hudson's charges without prejudice, because Rebecca was unavailable to testify as a witness.

---

[2] For instance, the woman said, "Mark you, you don't wanna be fair. . . . You don't wanna be married, you don't wanna be in a marriage you wanna be by yourself. . . . You wanna sneak around and do stuff I don't like that. I really don't like that."

2

On April 3, 2012, the State charged Hudson by amended information with tampering with a witness – domestic violence (count I), domestic violence misdemeanor violation of a court order (count II), and second degree assault – domestic violence (count III). The witness tampering and violation of a court order charges arose from the four phone calls—particularly the November 2nd call—that Hudson made from jail.

At trial, the State played the four recorded jail calls for the jury. Rebecca denied receiving any jail calls from Hudson, so the identity of the woman in the November 2nd phone call was a contested issue at trial. Detective Johnson testified that he investigated Hudson's jail calls. Johnson explained that he reviewed the recorded jail calls, the recording of Rebecca's 911 call, and the recorded statement he took from her while investigating the alleged assault. Over objection, Johnson testified that he concluded it was Rebecca's voice on the jail calls. He noted that the number he used to call Rebecca during his investigation was the same number Hudson called from jail. And, the content of the calls indicated to him that Hudson spoke with Rebecca from jail.

Rebecca testified at trial that her name was Rebecca Brooks, not Rebecca Hudson. She claimed that she and Hudson were just friends and they had never been married. She testified that on the night of September 16, 2010, she had a fight with John Jackson, her boyfriend at the time. She said that she angrily hit the television and cut her thumb on the broken screen. She claimed that she did not read, sign, or initial the statement the officer wrote at the scene, explaining that she lied to the responding officers that night.

Rebecca testified that she was born in Texas. Her family, including her twin sister, lives there. She explained that, in the fall of 2010, she went to Texas to look for a

3

job, but returned when she could not find one. On November 4, 2010, Rebecca sent an e-mail to the prosecutor's office saying that she had relocated to Texas. She used the e-mail address "rebecca.ann.hudson@gmail.com" and signed it as "Rebecca Hudson." Rebecca later said that she lied about her name and made up the e-mail address. The e-mail was not admitted into evidence. However, the prosecutor argued in closing that "Rebecca followed [Hudson's] advice" to relocate to Texas. Then, in rebuttal, the prosecutor specifically mentioned the e-mail: "she sent that E-mail to the prosecutor that she relocated to Texas." Hudson did not object to these comments.

The jury was unable to reach a verdict on the assault charge, so the trial court dismissed that count with prejudice. The jury found Hudson guilty of witness tampering and violation of a court order. The trial court sentenced Hudson to 30 days on each count, to run concurrently.

Hudson appeals both his felony conviction for witness tampering and his misdemeanor conviction for violation of a court order.

## DISCUSSION

Hudson makes three arguments on appeal. First, he argues that there is insufficient evidence to support his conviction for witness tampering. Second, he contends that the trial court erred in permitting Detective Johnson to testify to the identity of the woman's voice on the jail calls, because he had no expertise in voice identification, no personal knowledge of the woman's voice, and no greater ability to identify it than the jury did. Third, Hudson argues that the prosecutor's unobjected-to

4

reference to evidence outside the record amounts to flagrant and ill-intentioned prosecutorial misconduct.[3]

I. Insufficient Evidence for Witness Tampering

Hudson argues that there is insufficient evidence as a matter of law to support his conviction for tampering with a witness. The jury instructions stated that, to convict for witness tampering, the defendant must have "attempted to induce a person to, without right or privilege to do so, withhold any testimony or absent himself or herself from any official proceeding." (Emphasis added.) Hudson argues that the State failed to prove that the potential witness, Rebecca, was "without right or privilege" to absent herself from the proceedings, because she never received a subpoena and was therefore not required to appear in court. The State agrees and concedes that there is insufficient evidence to support the conviction. We accept the State's concession. Accordingly, we reverse and dismiss Hudson's conviction for tampering with a witness. State v. Hickman, 135 Wn.2d 97, 103, 954 P.2d 900 (1998).

II. Detective's Lay Testimony About Voice Identification

Hudson argues that the trial court erred by allowing Detective Johnson to identify Rebecca's voice in the recorded jail calls. Hudson asserts that Johnson had only a single phone conversation with Rebecca and no expertise in voice identification. Therefore, he argues, the jury had the same ability as Detective Johnson to compare

---

[3] Hudson points out that his convictions were designated as domestic violence convictions, so the State had to prove that Rebecca was a member of his family or household. RCW 10.99.020(5). Hudson does not concede that the State proved this. However, he assigns no error to this issue and devotes no argument in his opening brief to whether the State proved the domestic violence designations. We therefore need not consider it. RAP 10.3(a)(4), (a)(6).

5

the recorded voices. Hudson contends that admitting this testimony violated his right to a jury trial under the federal and state constitutions.

Though Hudson characterizes this issue as a constitutional one, subject to de novo review, we review a trial court's decision to admit lay opinion testimony for abuse of discretion. State v. Ortiz, 119 Wn.2d 294, 308, 831 P.2d 1060 (1992); see also State v. Kirkman, 159 Wn.2d 918, 927-28, 155 P.3d 125 (2007) (noting that such testimony may have constitutional implications, but the standard of review is abuse of discretion). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. State v. George, 150 Wn. App. 110, 117, 206 P. 3d 697 (2009).

A witness must testify based on personal knowledge. ER 602. A lay witness may give opinion testimony if it is (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the testimony or determination of a fact in issue. ER 701. A witness may not offer opinion testimony regarding the defendant's guilt, either by a direct statement or by inference. George, 150 Wn. App. at 117. However, testimony is not objectionable simply because it embraces an ultimate issue the trier of fact must decide. Id.

Opinion testimony identifying individuals in surveillance photographs or voice recordings runs the risk of invading the province of the jury and unfairly prejudicing the defendant. See id. at 118. But, a lay witness may give opinion testimony as to the identity of a person, as long as there is some basis for concluding that the witness is more likely to correctly identify the individual from the recording than is the jury. See id.; see also State v. Hardy, 76 Wn. App. 188, 190, 884 P.2d 8 (1994). aff'd and remanded by State v. Clark, 129 Wn.2d 211. 916 P.2d 384 (1996).

In Hardy, officers testified to the identities of defendants shown in videos of drug transactions. 76 Wn. App. at 189. The officers had known the defendants for several years, so they were more likely than the jury to correctly identify the defendants. Id. at 191-92. In George, by contrast, a detective reviewed a surveillance video and identified the defendants based only on their build, the way they moved, what they were wearing, how they compared to each other and others involved, and speaking with them on the day of the crime. 150 Wn. App. at 119. The detective's contacts fell short of the extensive contacts in Hardy and did not support a finding that the detective knew enough about the defendants to identify them in the video. Id. The jury was also able to view the surveillance video and 67 still frame images from the video. Id. at 115.

Here, Detective Johnson's testimony about Rebecca's identity was rationally based on his personal knowledge and perceptions. He spoke to Rebecca twice on the phone during his initial investigation and took a recorded statement from her. He reviewed this recording, along with Rebecca's 911 call and Hudson's jail calls while investigating the case. This gave Johnson a greater ability to identify Rebecca's voice than the jury. Unlike George, Johnson also based his conclusion on his personal knowledge of Rebecca's phone number. He used the same number to reach her during his investigation that Hudson used to contact her from jail. The content of the jail calls also indicated to him that Rebecca was the recipient.

Furthermore, Detective Johnson had special knowledge of Rebecca's voice that was helpful to the jury in determining her identity in Hudson's jail calls. Rebecca admitted to calling the police the night of the alleged assault, but the 911 recording was not admitted into evidence. Because the jury could not listen to the 911 call, Johnson's

testimony was helpful in linking Rebecca's voice to Hudson's jail calls. Likewise, Rebecca admitted to giving Johnson a recorded statement and admitted that the voice on that recording sounded like her. However, only brief portions of the recording were played for the jury to impeach Rebecca's testimony. The recording was not admitted into evidence, so the jury could not listen to it during deliberations. Detective Johnson, on the other hand, was able to listen to the recorded statement repeatedly. This makes Johnson's testimony distinguishable from George, because Johnson had unique knowledge of Rebecca's voice that made him more likely to correctly identify her.

We hold that the trial court did not abuse its discretion in allowing Detective Johnson to testify that he believed Rebecca's voice was the one in Hudson's jail calls.

III.   Prosecutorial Misconduct

Hudson argues that the State committed prosecutorial misconduct by referring to evidence not admitted at trial. Specifically, he objects to the prosecutor's reference to Rebecca's e-mail stating that she relocated to Texas, implying that Rebecca followed Hudson's advice to move to Texas. The e-mail was not admitted into evidence. Hudson argues that this misconduct requires us to reverse his witness tampering conviction. The State admits that the prosecutor improperly referred to the e-mail, but points out that Hudson failed to object to the comment.

Prosecutorial misconduct is grounds for reversal if the prosecutor's conduct was both improper and prejudicial. State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011). We review a prosecutor's conduct in the full trial context, including the evidence presented, the total argument, the issues in the case, and the jury instructions. Id. Referring to evidence outside the record is improper. State v. Fisher, 165 Wn.2d 727,

747, 202 P.3d 937 (2009). However, a defendant suffers prejudice only when there is a substantial likelihood that the prosecutor's conduct affected the jury's verdict. Monday, 171 Wn.2d at 675. Absent a timely objection, reversal is required only if the conduct is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative jury instruction. State v. Warren, 165 Wn.2d 17, 43, 195 P.3d 940 (2008).

This issue is now moot as to Hudson's witness tampering conviction, because we reverse and dismiss that conviction for insufficient evidence. Therefore, the prosecutor's reference to Rebecca's e-mail could not have prejudiced the outcome of the trial on that charge.

Hudson does not argue that the alleged prosecutorial misconduct requires reversal of his conviction for violation of a court order. We nevertheless consider this issue, because the e-mail could conceivably help connect Rebecca to Hudson's jail calls.

Examining the record as a whole, however, we conclude that no prejudice resulted from the prosecutor's improper reference to Rebecca's e-mail. Detective Johnson properly testified that he believed Rebecca to be the recipient of Hudson's jail calls. All the calls Hudson made from jail were to Rebecca's phone number at the time, further establishing her identity. Rebecca testified that she attempted to find a job in Texas, which linked the content of the November 2nd call to her. The jury also had the opportunity to weigh Rebecca's credibility when she testified that she did not speak to Hudson in jail. We defer to the jury's assessment of witness credibility. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), abrogated on other grounds by

9

Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). We hold that the prosecutor's passing reference to Rebecca's e-mail did not cause any enduring prejudice, given the ample evidence that Hudson called Rebecca from jail, violating the no-contact order.

We affirm Hudson's conviction for violation of a court order. We reverse and dismiss his conviction for tampering with a witness.

Appelwick, J.

WE CONCUR:

Leach, C.J.          Spearman, J.